# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

IN RE THE APPLICATION OF
DULCE ESPERANZA MENDEZ GONZALEZ,

                    Plaintiff/Petitioner

v.                                      Civil No.   14-00799 WJ/CG

EMILIO CONTRERAS BATRES,

                    Defendant/Respondent.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR RETURN OF CHILDREN

THIS MATTER comes before the Court upon Petitioner Dulce Esperanza Mendez Gonzalez's Verified Complaint and Petition for Return of the Children (**Doc. 1**), filed September 4, 2014. On January 9, 2015 following an evidentiary hearing on January 8, 2015, the Court announced its decision granting Petitioner's petition and ordering immediate return of the Children to Petitioner's custody in Mexico.  This order sets forth the Court's written findings of fact and conclusions of law.

### FINDINGS OF FACT

1.      Petitioner Dulce Esperanza Mendez Gonzalez and Respondent Emilio Contreras Batres are Mexican citizens. Respondent is a lawful permanent resident of the United States living in Las Cruces, New Mexico.

2.      Petitioner and Respondent met in Mexico and began a relationship. After Respondent lawfully entered the United States, he then hired a third party to bring Petitioner and her two children from a previous relationship unlawfully into the United States.

3.      After Petitioner moved into Respondent's home in Las Cruces, their children E.E.C.M. and D.M.C.M. (hereinafter "the Children") were born in that city. Both of the Children are United States citizens.

4.      The relationship between Petitioner and Respondent deteriorated and Petitioner testified that she was the victim of domestic violence although she never filed any type of report with local law enforcement nor did she ever seek any kind of domestic order of protection. Petitioner decided to end the relationship with Respondent, and on April 3, 2013, without informing Respondent, Petitioner took the Children, along with her two older children, to Gómez Palacio, Durango, Mexico, where Petitioner and her four children moved in with Petitioner's mother, a resident of Gómez Palacio.  Petitioner has and continues to reside with her mother.

5.      Respondent's mother and brother reside in Torreón, Durango, Mexico, which is approximately a thirty minute drive from Gómez Palacio.  With the help from members of his family, Respondent discovered Petitioner's whereabouts and traveled to Gómez Palacio on April 5, 2013, at which time he saw Petitioner and the Children.

6.      Respondent visited the Children in Gómez Palacio approximately every other weekend thereafter, sometimes taking them to the home of his mother.

7.      While the Children lived in Gómez Palacio, E.E.C.M. began to attend kindergarten or daycare and took part in various school activities. Meanwhile, D.M.C.M. visited at least one doctor in the region for treatment of illness.

8.      In November 2013, Respondent visited several governmental entities in an attempt to secure a more favorable custody arrangement over the Children. One of those entities was the Office of the Public Prosecutor (also referred to as the Fiscalia) for the State of Durango.

9.      Respondent's attorney and an employee of the Fiscalia served Petitioner with a summons to appear at the Fiscalia office in nearby Ciudad Lerdo, Durango, on November 29, 2013. *See* **(Petitioner's Ex. 2)**.

10.     On the designated date, both parties appeared before the Agent in charge of Conciliation at the Fiscalia. Petitioner and Respondent were both represented by attorneys at this meeting.

11.     A document entitled "Convenio" (hereinafter "the Agreement") was prepared at or as a result of the November 29, 2013 meeting. By its terms, the Agreement gives Petitioner primary custody of the Children while allowing Respondent to visit with the Children every other weekend on Friday afternoons and Saturdays from 8 A.M. to 7 P.M. The Agreement also states that the parties appeared for the meeting voluntarily and that Respondent "stated he had no problem at all for [*sic*] the minor children E[.] and D[.] . . . to live with their mother at the residence located . . . in the city of Gómez Palacio, Durango." Finally, the Agreement states that the parties did not appear under coercion, in error, or in bad faith. *See* **(Petitioner's Ex. 1)**.

12.     The Agreement was dated November 29, 2013, and signed by the Agent for the Fiscalia, the parties, and their respective attorneys.

13.     On November 29 and 30, 2013, Respondent picked up and subsequently dropped off the Children as part of the prearranged custody Agreement.

14.     On Friday, December 13, 2013, Respondent picked up the Children at 5 P.M. and returned them to Petitioner at 9 P.M., pursuant to the terms of the Agreement.

15.     After picking up the Children for a scheduled visitation on Saturday, December 14, 2013, Respondent returned to the United States with the Children without Petitioner's consent.

16.     At the time of their removal, E.E.C.M. was a few days shy of her fourth birthday, and D.M.C.M. was two years old.

17.     On the night of December 14, 2013, after Respondent failed to timely return the children to Petitioner's home, Petitioner contacted law enforcement and visited the home of Respondent's mother. At that location, Respondent's sister told Petitioner that Respondent had not brought the Children there and that Petitioner should look in the United States since Respondent lived there and the Children were U.S. citizens.

18.     By December 16, 2013, Petitioner had filed a criminal complaint against Respondent for the abduction of the Children. *See* **(Petitioner's Ex. 3)**.

19.     On December 19, 2013, Petitioner filed an application seeking the Children's return under the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "Hague Convention" or "Convention").

20.     The United States of America and the United Mexican States are both signatory nations to the Hague Convention.

### PROCEDURAL HISTORY

Petitioner filed her Verified Complaint and Petition for Return of the Children (hereinafter "Petition") on September 4, 2014.[1] Twelve days later, United States District Judge Robert C. Brack granted a temporary restraining order enjoining Respondent from removing the Children from the jurisdiction of this Court pending a hearing on the merits. *See* **(Doc. 10)**.

---

[1] This document was distinct from her December 2013 application to Mexican authorities. *See Ohlander v. Larson*, 114 F.3d 1531, 1535 n.3 (10th Cir. 1997) (citing former 42 U.S.C. § 11602(1), (4)).

Under direction of the Court, the United States Marshals Service served the summons on Respondent, along with copies of the Petition and the temporary restraining order, at Respondent's home in Las Cruces on September 18, 2014.

A Pre-Hearing Conference was held on September 30, 2014, at which both parties appeared through their respective attorneys. At the urging of the parties, the Court set a November 2014 in-person status conference before United States Magistrate Judge Carmen E. Garza so that an abbreviated discovery period could be arranged. The Court also entered a preliminary injunction preventing Respondent from removing the Children from the jurisdiction of the Court until these proceedings were concluded. The Court and Judge Garza issued discovery and pre-trial deadlines on November 7, 2014. *See* (**Doc. 32**), Scheduling Order; (**Doc. 35**), Order Setting Pretrial Conference and Pretrial Deadlines.

The Court held an evidentiary hearing on January 8 and 9, 2015. At the hearing, Petitioner testified via video and telephonic transmission. Petitioner also presented the recorded deposition testimony of her expert witness, Mariano Nuñez Arreola. Respondent testified in person and presented the live testimony of his expert witness, Alfonso Cota, as well as that of his cousin Sofia Lopez.

### JURISDICTION

The United States District Court for the District of New Mexico has jurisdiction over this case under the Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, 1988 WL 411601, as implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*,[2] and under 22 U.S.C. § 9003(a). Venue in this Court

---

[2] ICARA was formerly codified at 42 U.S.C. § 11601, *et seq.* The statutes were transferred to their present location in the United States Code in 2014, with 42 U.S.C. § 11601 transferred to 22 U.S.C. § 9001, 42 U.S.C. § 11602 transferred to 22 U.S.C. § 9002, and so on.

is also appropriate since the Children were located within the Court's jurisdiction at the time the Petition was filed. *See* 22 U.S.C. § 9003(b).

ANALYSIS

## I.      Legal Standard

To be eligible for relief, Petitioner bears the burden of establishing, by a preponderance of the evidence, that the Children were "wrongfully removed . . . within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). To show wrongful removal, Petitioner must prove that (1) the Children were habitually resident in a signatory state at the time of their removal; (2) the removal was in breach of Petitioner's custody rights under the laws of that state; and (3) Petitioner was exercising those rights at the time of removal. *See Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002).

If Petitioner proves a prima facie case of wrongful removal, the burden shifts to Respondent "to establish one of the affirmative defenses or 'narrow exceptions set forth in the Convention.'" *West v. Dobrev*, 735 F.3d 921, 931-32 (10th Cir. 2013) (quoting former 42 U.S.C. § 11601(a)(4), now at 22 U.S.C. § 9001(a)(4)). Such defenses "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1067 (6th Cir. 1996). If Petitioner shows that her children were wrongfully removed and Respondent does not establish an appropriate defense, the Court must "order the return of the [Children] forthwith," Hague Convention, art. 12. "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich II*, 78 F.3d at 1067 (internal citations omitted).

6

Importantly, the general purpose of the Hague Convention is "to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Id.* at 1064; *see also* Hague Convention, art. 1. The Court must therefore emphasize that it does *not* have jurisdiction to address the merits of any underlying custody dispute between Petitioner and Respondent. Hague Convention, art. 19; 22 U.S.C. § 9001(b)(4); *see also Friedrich II*, 78 F.3d at 1063. For present purposes, this means that the Court cannot grant or deny Petitioner's request simply because either party might be the more "suitable" parent or because a grant of custody to either parent would be in the Children's "best interests," as those questions are better left to courts in the Children's state of habitual residence. *See Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997) (citation omitted).

## II.   Petitioner's Prima Facie Case

As discussed above, the three elements Petitioner must prove by a preponderance of the evidence are that (1) the Children's habitual residence was in Durango, Mexico; (2) she was exercising custody rights under that state's laws at the time of their removal; and (3) their removal was in breach of those custody rights. *See Shealy*, 295 F.3d at 1122.

### A.   Habitual Residence

"A person can have only one habitual residence." *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1401 (6th Cir. 1993). Habitual residence is measured at the time "immediately before the [Children's] removal." Hague Convention, art. 12. However, the Convention does not define the term "habitual residence," and as such the term "is defined by examining specific facts and circumstances" of the case. *Carrasco v. Carrillo-Castro*, 862 F. Supp. 2d 1262, 1269 (D.N.M. 2012) (quoting *Kanth v. Kanth*, 232 F.3d 901, 2000 WL 1644099, at *1 (10th Cir.

2002) (unpublished table decision)). The Court's determination here is a mixed one of law and fact. *Carrasco*, 862 F. Supp. 2d at 1269.

Despite the ambiguity of the phrase, one thing is clear: "habitual residence" is not the same as mere "domicile." *Id.* (citing *Re Bates*, [1989] EWHC (Fam) CA 122/89, 1989 WL 1683783 (transcript) (Eng.)). Instead, "habitual residence pertains to customary residence prior to the removal." *Friedrich I*, 983 F.2d at 1401. Thus, the most commonly adopted test holds that a child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). The focus of this determination should generally be on the child, consisting "of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *See id.* "[I]n the case of a young child the conduct, intentions, and agreements of the parents during the time preceding the abduction are important factors to be considered." *Kanth*, 2000 WL 1644099, at *1 (citing *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1285 (S.D. Fla. 1999)). A child's citizenship does not conclusively settle the matter. *See, e.g.*, *Friedrich I*, 983 F.2d at 1401 (finding Germany to be a child's habitual residence even though he was at all times a United States citizen). Since all of this pertains to the time "immediately before" removal, "[t]he [C]ourt must look back in time, not forward," in determining the Children's habitual residence. *Friedrich I*, 983 F.2d at 1401.

Several prior Hague Convention cases inform the Court's determination in the instant matter. In *Re Bates*, an English case upon which several U.S. courts have relied, the child's English "pop musician" father and American mother frequently traveled on tour and used the father's London home as a family "base." *See* 1989 WL 1683783. The relationship was already

faltering when the parents reached an "acrimonious" agreement that the mother and 2.5-year-old child would live in New York while the father undertook a worldwide tour, allowing the child to see an American speech therapist. *See id.* After the mother and child had settled in New York for a mere few weeks, a telephone argument arose, and the father (who was out of country on tour) authorized the nanny to remove the child from the New York apartment to the London house. *See id.* Giving special attention to the child's young age, the court considered the parents' conduct and their "overtly stated intentions and agreements" prior to abduction in concluding that the child's habitual residence was New York. *See id.* The court decided that various factors, including "[e]ducation, business or profession, employment, health, family, or merely love of the place," may evidence "a degree of settled purpose," even if that purpose is for a limited time. *See id.* (quotation omitted).

*Friedrich I* concerned a young boy, born in Germany to a German father and a female American soldier, who lived in Germany until the mother removed him to the United States after the father kicked her out of their home. *See* 983 F.2d at 1398-99. When the father sought relief under the Convention, the mother argued that the U.S. was the child's habitual residence because he was an American citizen, his U.S. documentation listed an Ohio location as his permanent address, and the mother had always intended to return with him to the U.S. after her military discharge. *See id.* at 1401. Relying in large part on *Re Bates*, the Sixth Circuit rejected this forward-oriented analysis, noting that habitual residence "can be 'altered' only by a change in geography and the passage of time . . . before the questionable removal." *See id.* at 1401-02.

In *Feder*, when an American family moved to Australia, the father eagerly sought permanent residency there while the mother held onto her U.S. driver's license, did not apply for residency, and contemplated returning to the United States if their marriage failed. *See* 63 F.3d at

219. Their four-year-old child lived with them in Australia for six months, attending preschool and enrolling in kindergarten there, and the entire family obtained Australian Medicare cards. *See id.* at 219-20. When the marriage failed, the mother permanently returned to the U.S. with the child without obtaining the father's consent. *See id.* Applying the logic of *Re Bates* and *Friedrich I*, the Third Circuit concluded that Australia was the child's habitual residence in light of the child's young age, his participation in schooling ("one of the most central activities in a child's life"), and the parents' shared pursuit of an Australian residence and employment. *See id.* at 222-25. The fact that the child had previously spent most of his young life in the U.S., and the fact that the mother had intended to return to the U.S. if their marriage fell apart, did not alter the analysis. *See id.*

    With these cases in mind, the Court concludes that the conduct, intentions, and agreements of the parents here, along with other indicia of settled purpose, demonstrate that Durango, Mexico was the Children's state of habitual residence. Although the Children were only living in Mexico for approximately eight months prior to their removal, *Re Bates* and *Feder* make clear that habitual residence may be established in such a brief period if the parents' shared intentions and the children's living arrangements "amount[] to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." *Re Bates*, 1989 WL 1683783. This may be true even if the Children spent a majority of their lives in the United States before arriving in Mexico, *see Feder*, 63 F.3d at 224, and even though the Children were U.S. citizens, *see Friedrich I*, 938 F.2d at 1401.

    Here, E.E.C.M. had begun schooling in Durango, and D.M.C.M. had sometimes received medical care in that state, both of which are strong evidence of settled purpose. *See Re Bates*, 1989 WL 1683783; *see also Feder*, 63 F.3d at 222-25. Moreover, although Respondent (like the

father in *Re Bates*) was plainly not happy about the prospect of his children living away from him in Mexico, his frequent visits to Gómez Palacio and the Agreement he worked out with Petitioner, whatever its legal effect, are evidence that both parents were planning their lives around the Children living in Durango. Although Respondent testified that he felt pressured to sign the Agreement by the other persons present at the Fiscalia on November 29, 2013, he presented no evidence of coercion or bad faith on the part of any other participant at that meeting. Additionally, the Court finds it probative that Respondent initiated the proceedings that led to the Agreement, that the Agreement stated that the parties were participating voluntarily and in good faith, that Respondent was represented by an attorney at that meeting, and that both Respondent and his attorney signed the Agreement.

Respondent points to *Miller v. Miller*, a Fourth Circuit decision, to assert that the location where a child was born and has spent most of his life is a substantial factor in the habitual-residence determination. *See* 240 F.3d 392 (4th Cir. 2001). In that case, after an American father assaulted his Canadian ex-wife in Ontario and removed their children from the country without her permission, the mother sought relief under the Hague Convention in the United States. *See id.* at 396-97. In determining that the children's habitual residence was Canada, the Fourth Circuit acknowledged that the children were born in and had indeed spent most or all of their lives in Canada. *See id.* at 400. Yet, the key to the court's decision was not simply the fact that the children "resided [in Canada] with their mother for a substantial portion of their lives," but that they did so "*until they were removed by their father to the United States*." *Id.* (emphasis added). As with the other cases cited here, the issue was not the children's country of origin or the location where they spent most of their lives, but their customary residence as measured "*immediately before the removal*." Hague Convention, art. 3 (emphasis added); *see also*

*Friedrich I*, 983 F.2d at 1401. The fact that a child has spent most of his or her life in one country, while sometimes relevant, is not dispositive. *See Feder*, 63 F.3d at 224 (chiding the district court for "plac[ing] undue emphasis on the fact" that the child had spent most of his years in a particular country).

Respondent tries to further muddy the waters by arguing that it was *Petitioner* who wrongfully removed the Children from the United States without Respondent's consent, implying that the Children's habitual residence should be measured from just prior to *that* removal. However, Respondent never filed a petition under the Hague Convention alleging that Petitioner wrongfully removed the Children. The Tenth Circuit has spoken to similar circumstances, recognizing that "once a petition is filed, a court should consider only whether a *respondent's* removals of a child are wrongful" rather than "whether the *petitioner's* removals of the child were wrongful." *See Ohlander*, 114 F.3d at 1539-40 (citations omitted). Thus, the fact that the Children may have been habitual residents of the United States until Petitioner took them to Durango, Mexico is irrelevant to the instant proceedings. Given the Petition that is before the Court, the appropriate point in time to consider in this case is not when Petitioner fled with the Children to Mexico, but when Respondent fled with the Children to the United States. Because the parents' shared intentions showed acclimatization and a degree of settled purpose for the Children in Mexico on the date of their removal from that country, the Children's habitual residence *at the time of removal* was Mexico.

Further, the purposes of the Hague Convention would be undermined if the Court were to accept Respondent's argument to the contrary. The Convention exists to provide a lawful and orderly way "to secure the prompt return of children wrongfully removed to . . . any Contracting State." Hague Convention, art. 1(a). When Petitioner left the United States with the Children,

Respondent could have pursued relief under the Convention himself by filing an application with the United States Central Authority, *see id.* art. 8; 22 U.S.C. § 9006(b), or by initiating administrative or judicial proceedings in Mexico, *see* Hague Convention arts. 8 & 12. Instead, Respondent engaged in a tit-for-tat invocation of what the Tenth Circuit has referred to as "the law of 'grab and run.'" *See Ohlander*, 114 F.3d at 1535. Simply stated, the Court must decide the Hague Convention case before it, not the one that could have been filed.

Petitioner has demonstrated by a preponderance of the evidence that at the time of their removal, the Children were acclimatized to Mexico and had a degree of settled purpose in that country as determined by the Children's circumstances and the parents' shared intentions. Accordingly, the Court finds that the Children's habitual residence was Mexico at the time of their removal.

B.  Exercise of Custody Rights

Next, the Court considers whether Petitioner was exercising custody rights over the Children at the time of their removal. A parent's custodial rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3. The Convention's broad language shows that "the law of the child's habitual residence is invoked in the widest possible sense." ELISA PÉREZ-VERA, EXPLANATORY REPORT ¶ 67 (1982), *available at* http://www.hcch.net/index_en.php?act=publications.details&pid=2779 (last visited Jan. 8, 2015).[3]

---

[3] The Explanatory Report of Elisa Pérez-Vera, the official Hague Conference reporter for the Convention, was "recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (Mar. 26, 1986).

Although Petitioner focuses much of her argument on whether the November 29, 2013 Agreement established her custody rights over the Children, she also asserts that she had custodial rights by operation of law. The Court considers the latter argument first.

i.     *Custody by Operation of Law*

Petitioner argues that for Hague Convention purposes, she was exercising custody over the Children "just by virtue of being their biological parent and not having had those parental rights terminated." The cornerstone of this position is the Mexican legal concept of *patria potestas*.

Both parties consider *patria potestas*, also referred to as *patria potestad*, to be a broad concept that covers a parent's general authority over and obligations to his or her child. After the parents have separated or divorced, the term *guarda y custodia* refers to an individual parent's physical custody of the child. Roughly speaking, then, *patria potestas* refers to parental authority in a broad sense, while *guarda y custodia* refers only to the physical custody granted to a parent.

The Court has previously taken judicial notice of the English translation of excerpts of the Civil Code for the State of Durango as provided by Petitioner. *See* **(Doc. 58)**, Order Granting in Part and Denying in Part Petitioner's Motion to Take Judicial Notice. According to Article 409 of the Durango Civil Code, "Parental authority/responsibility [*patria potestas*] is exerted by both parents." And according to Article 410, this applies to unmarried couples as long as both parents have recognized the child and live together. However, if the parents separate, Article 412 states that "they will both continue exerting parental authority/responsibility [*patria potestas*], and custody will be decided by means of an agreement between them or by [a] judge."

Even ignoring the November 29, 2013 Agreement, it seems evident that Petitioner was exercising custody rights over the children as understood by the Hague Convention. Under

Articles 409 and 410, Petitioner continued to possess *patria potestas* over the Children after her separation from Respondent; indeed, neither party asserts that the other's *patria potestas* authority had been extinguished. Numerous district court decisions in this Circuit have concluded that a parent with *patria potestas* authority has custody over his child for Hague Convention purposes. *See Gavia v. Hernandez*, No. 2:13-cv-00987, 2013 WL 6115725, at *9 (D. Utah Nov. 20, 2013); *Avila v. Morales*, Civ. A. No. 13-cv-00793-MSK-MEH, 2013 WL 5499806, at *12-13 (D. Colo. 2013); *Matas-Vidal v. Libbey-Aguilera*, No. 2:13CV422 DAK, 2013 WL 3995300, at *8 (D. Utah Aug. 5, 2013); *Carrasco*, 862 F. Supp. 2d at 1274-75 (D.N.M. 2012); *Avendano v. Smith*, 806 F. Supp. 2d 1149, 1173 (D.N.M. 2011); *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1123-24 (D. Colo. 2008). This is consistent with the broad definition found in the Convention. *See* Hague Convention, art. 5(a) ("'[R]ights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence . . . .") And Petitioner cannot have failed to have "exercised" her rights for Hague Convention purposes since there are no allegations of "acts that constitute clear and unequivocal abandonment of the child," *Friedrich II*, 78 F.3d at 1066.

Accordingly, the Court holds that Petitioner was exercising custody rights over the Children by operation of law.

## ii.    Custody Pursuant to the Agreement

Petitioner also points to the November 29, 2013 Agreement as an alternative or additional basis for determining that she possessed custody of the Children for Hague Convention purposes. In relevant part, the Agreement translation states:

> The other person appearing [Respondent] stated he had no problem at all for the minor children E[.] and D[.] . . . to live with their mother . . . in the city of Gómez Palacio, Durango, who shall have care and custody ["*guarda y custodia*" in the

original] of them although both persons appearing shall have parental rights ["*patria potestad*" in the original] to the above children.

(**Doc. 1 Ex. F**), Agreement.

On its face, the Agreement preserves both parents' *patria potestas* authority while assigning *guarda y custodia* rights to Petitioner. In other words, the Agreement assigns Petitioner custody in both the *patria potestas* and the *guarda y custodia* senses. Petitioner's expert witness agrees with this assessment and concludes that the Agreement has legal effect pursuant to Article 412 of the Durango Civil Code, which states that custody may "be decided by means of an agreement between [the parents]." Petitioner's expert supports his opinion with citations to and copies of the relevant Durango Civil Code provisions on *patria potestas*, including Article 412.

Respondent's expert witness testified that the Agreement could not have legal effect in Durango. First, he asserts that the Agreement is invalid because it is "impracticable to comply with," as it "establishes a bi-weekly visitation schedule to a parent that lives and works in a different country and at a [great] distance." As a result, he says, the Agreement is "not attending to the 'best interest of the child'" and "diminishes [the children's] ability to coexist with their parent, a child's right." The Court is obligated to decline this invitation to consider the merits of the Agreement. Convention, art. 19; 22 U.S.C. § 9001(b)(4); *Friedrich II*, 78 F.3d at 1063. Any dispute regarding the validity of the terms of the Agreement should be resolved by the appropriate court in Mexico.

Next, despite the implications of Article 412, Respondent's expert intimates that the Durango Civil Code has expired or will soon expire as part of a transition to a more unified Mexican federal legal code. However, in his report, Respondent's expert did not discuss any changes in Mexican statutes—or, indeed, cite to any statutes at all—and Respondent failed to provide any evidence of any such alterations to the Durango Civil Code. Though Respondent

16

later offered to provide these materials to the Court, the discovery period that the parties themselves requested expired well over a month ago, and the time for supplementation has long since passed. The Court therefore has no reliable basis to conclude that the state of the operative legal code in Durango has been modified as Respondent's expert maintains.

Finally, Respondent's expert cites three Mexican legal decisions that purport to show that any alteration or termination of *patria potestas* rights must be made through the judicial process, and from this he asserts that *guarda y custodia* rights are subject to the same restriction. This reading of the law seems to ignore the distinctions between *patria potestas* authority and custody as implied in both Article 412 and the Agreement itself. More importantly, unlike Petitioner's expert witness, Respondent's expert provided no copies (let alone English translations) of the authorities on which he relies. Though his report included some brief quotations from the legal decisions he cited, the Court cannot rely on isolated quotations from legal authorities without having the basis to examine the decisions as a whole.

The deficiencies in Respondent's expert disclosures are not news to the parties. On December 22, 2014, although the Court denied Petitioner's request that Respondent's expert be precluded from testifying, Respondent was put on notice that his disclosures were plainly deficient in part due to his failure "to provide any copies and translations of the foreign authorities to which [his expert] refers in his report." (**Doc. 55**), Order Granting in Part and Denying in Part Petitioner's Motion to Exclude Testimony, at 3. Petitioner complied with the Court's discovery orders from the outset, and Petitioner's expert witness provided copies of the legal authorities upon which we relied. By contrast, Respondent not only failed to timely comply with his disclosure requirements, but also failed to provide copies of any authorities that he relied on, even after the Court advised him of these deficiencies. Without these materials, the Court is

unable to fully rely on the legal conclusions presented by Respondent's expert witness.  Stated another way, the Court in the exercise of its gate-keeping function for the admissibility of expert witness testimony, is unable to make a finding that the expert opinion testimony of Respondent's expert witness is sufficiently reliable to be considered by the Court.

For the above-stated reasons, the Court holds that the Agreement formalizes Petitioner's custody rights over the Children, in both the *patria potestas* and *guarda y custodia* senses. Moreover, Petitioner has shown that she was exercising those custody rights at the time of the Children's removal. *See Friedrich II*, 78 F.3d at 1066. The Court therefore concludes that Petitioner has established, by a preponderance of the evidence, that she was exercising custody rights over the Children by reason of an Agreement between the parties.

C.   Breach of Custody Rights

The Court also concludes that Respondent's removal of the Children from Mexico constituted a breach of Petitioner's custody rights. The strongest basis for this conclusion is the fact that the Agreement granted custody to Petitioner, and thus the Children's removal from the country would constitute a breach of the express terms of that Agreement. This fact provides overwhelming evidence that Respondent breached Petitioner's custody rights by removing the Children.

Even setting aside the Agreement, however, Respondent's removal of the Children rises to the level of a breach of custody simply by operation of law. Notably, Article 416 of the Durango Civil Code states that a parent's rights "in relation to" his children may be suspended or terminated if that parent removes his children from their habitual residence without the consent of the parent(s) exercising *patria potestas* authority. Article 416 also says that the child himself cannot leave the homes of those exerting *patria potestas* authority over him without those

parents' permission. These provisions should be read in the context of Article 409, which gives both parents *patria potestas* rights, and Article 412, which requires separated parents to each continue to fulfill their *patria potestas* obligations and resolve disputes before a judge. Finally, the Convention itself states that "rights of custody" include the right to determine a child's place of residence, Hague Convention, art. 5(a), and as noted above the concept of *patria potestas* encompasses this term.

Reading these statutory provisions together, the Court finds that under Durango law, if two parents exercise *patria potestas* rights, both must consent to the child's removal, or else the non-removing parent's custody rights have been breached for Hague Convention purposes. *See Avila*, 2013 WL 5499806, at *12 (finding that removal constituted breach under Durango Civil Code since the petitioner had *patria potestas* rights); *see also Whallon*, 230 F.3d 450, 458 (1st Cir. 2000) (considering Baja California Sur statutes); *Carrasco*, 862 F. Supp. 2d at 1275 (finding breach of custody under analogous Chihuahua Civil Code, in part because one parent retained the child without the other parent's permission despite both holding *patria potestas* authority).

Therefore, Petitioner has established by a preponderance of the evidence that her custody rights were breached by Respondent's removal of the Children from Mexico, both through operation of law and because Respondent violated the express terms of their Agreement. Because she was exercising these custody rights and the Children were habitual residents of Mexico at the time, Petitioner has shown by a preponderance of the evidence that Respondent's removal of the Children was wrongful.

### III.    Grave Risk

Nonetheless, Respondent argues in his trial brief that the Court should refrain from returning the Children to Mexico because "there is a grave risk that [their] return would expose

[them] to physical or psychological harm or otherwise place [them] in an intolerable situation." Hague Convention, art. 13(b). Respondent bears the burden of establishing this affirmative defense by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2)(A). However, Respondent submitted no evidence or testimony at the hearing showing that the Children might face a grave risk of harm should they be returned to Mexico. The Court therefore finds that the grave-risk defense has not been established.

### CONCLUSION

The Court does not rule on the Petition before it lightly. Having presided over several Hague Convention petitions, the Court recognizes the sensitivity of the matters at stake. The Court also believes that it is important for the Children to have an opportunity to develop a meaningful relationship with both of their parents. The Court expresses its hope that Petitioner and Respondent, working through the appropriate Mexican legal processes and through the Mexican family courts, can develop a custody arrangement that is to the satisfaction of both parents as well as to the Children. For present purposes, though, in light of the facts, the evidence, and the relevant law, the Court holds that Respondent wrongfully removed the Children from the custody of Petitioner as defined under the Hague Convention and that the Children should be returned "forthwith." Hague Convention, art. 12.

IT IS THEREFORE ORDERED that Petitioner Dulce Esperanza Mendez Gonzalez's Verified Complaint and Petition for Return of the Children (**Doc. 1**) is hereby GRANTED, and the Children E.E.C.M. and D.M.C.M. are to be returned to the custody of their mother in Mexico.[4]

---

[4] The Court has previously entered an Order for Return of Children setting forth the means by which the Children were to be returned to Petitioner. *See* (**Doc. 61**).

IT IS FURTHER ORDERED that Petitioner shall file any motion for costs and fees pursuant to 22 U.S.C. § 9007(b)(3) and Article 26 of the Hague Convention no later than **30 days** from the filing date of this Order. Respondent may file a response no later than **14 days** after Petitioner files such a motion.

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE